| 138 | 620 |
|-----|-----|
| 194 | c341 |

| 138 | 620 |
|-----|-----|
| 200 | 2228 |
| 200 | 2229 |

| 138 | 620 |
|-----|-----|
| 207 | 1286 |

## SARAH M. MOFFETT

*v.*

## THE SOUTH PARK COMMISSIONERS.

*Filed at Ottawa October 31, 1891.*

1. DEDICATION TO THE PUBLIC—*irrevocable after acceptance.* ·Where the owner of land makes a dedication, as at common law, of a strip· thereof for a public highway, and the public accepts the same, neither he nor subsequent owners claiming under him can repudiate his acts· and regain possession of such strip of land.

2. SAME—*how made.* Whether or not a proprietor of land has made a dedication of the same, or of a part thereof, to the public, is always a question of fact. No particular form is required to the validity of the dedication, but it may be made in any way from which the intention of the dedicator can be evidenced.

3. SAME—*proof of intention to dedicate.* The proof must be clear of an actual intention to dedicate, or of such acts and declarations as should equitably estop the owner from denying such intention. He must do some act, or suffer some act to be done, from which it can be fairly inferred he intended a dedication to the public. Such intention may be proved by the conduct and declarations of the party, and any act of his satisfactorily showing an intention to dedicate is sufficient.

4. In arriving at a conclusion as to whether an act was done by a land owner with the intent to dedicate his land to the public use, the location of the property and all its surroundings must be considered. Thus, the intention to dedicate will be more readily presumed in regard to urban than country property, and in regard to well settled or frequented country than in regard to wild, wood, waste or unfrequented land.

5. In this case the facts and circumstances are stated, from which the court holds that the owner of land, by his acts and conduct, made a dedication of a strip of land to the public for a highway, and that the same was accepted by the public and those in charge of the highways and streets.

6. EVIDENCE—*of witness fourteen years of age — admissibility and weight.* The testimony of a witness as to the location of a fence, based. on measurements made when he was of the age of fourteen years, in which he assisted, is admissible, though not entitled to the same weight that it would have had if he had been of more mature age and judgment at the time he assisted.in the survey and measurement.

APPEAL from the Superior Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

Mr. E. A. OTIS, for the appellant:

As to the question of dedication, see *Bloomington* v. *Cemetery Ass.* 126 Ill. 221; *McIntyre* v. *Storey*, 80 id. 127; *Chicago* v. *Johnson*, 98 id. 618; *Warren* v. *Jacksonville*, 15 id. 236; *Kyle* v. *Logan*, 87 id. 64; *Chicago* v. *Hill*, 124 id. 646; *Chicago* v. *Stinson*, id. 510; *Grube* v. *Nichols*, 36 id. 92; *Kelly* v. *Chicago*, 48 id. 389; *Herhold* v. *Chicago*, 108 id. 467; *Dexter* v. *Tree*, 117 id. 532; *Gentleman* v. *Soule*, 32 id. 279; *State* v. *Crow*, 30 Iowa, 258; *Manrose* v. *Parker*, 90 Ill. 581; *Harding* v. *Town of Hale*, 61 id. 192; *Marcy* v. *Taylor*, 19 id. 634.

Mr. A. W. GREEN, for the appellees:

As to the question of dedication and the evidence thereof, see *Cincinnati* v. *White*, 6 Pet. 431; Dillon, secs. 636, 637; *Thayer* v. *Boston*, 19 Pick. 514; *Grube* v. *Nichols*, 36 Ill. 92; *Green* v. *Oakes*, 17 id. 249; *Maywood Co.* v. *Maywood*, 118 id. 61; *Warren* v. *Jacksonville*, 15 id. 236; *Chicago* v. *Stinson*, 124 id. 510; *Chicago* v. *Hill*, id. 646; *Weber* v. *Anderson*, 73 id. 439; *Falloon* v. *Simshauser*, 130 id. 649; Washburn on Easements, (3d ed.) 132.

Mr. JUSTICE WILKIN delivered the opinion of the Court:

This is a petition by appellant, against appellees, in the Superior Court of Cook county, under the Burnt Records act to establish title to the south thirty-three feet of lots 7, 8 and 9, in Jennings & Moffett's subdivision of the south sixty acres of the east half of the south-west quarter of section 10, township 38, range 14, east, in Cook county, Illinois. The petition sets up a chain of title from the government, showing petitioner to be the owner of the premises, and avers that appellees are in possession of the same without right. The answer of appellees sets up a perpetual easement in the public over the lands de-

scribed in the petition for a highway, and says they took possession thereof as a part of Fifty-fifth street, under acts of the legislature, in force February 24 and April 16, 1869. The court below found and decreed the title in appellant in fee, but subject to the easement set up in the answer.

All parties agree that prior to 1855 one William B. Eagan became the owner in fee of the sixty-acre tract of which the strip in dispute was then a part, and that he continued to own it until some time in February, 1859, when he conveyed it to one Francis M. Drexel. The evidence shows that prior to February, 1869, John D. Jennings and E. M. Moffett, through *mesne* conveyances from said Drexel, became the owners in fee thereof, and by plat duly executed on the 25th of that month, subdivided it, laying off three lots on the south, numbered from east to west, 7, 8 and 9. There is no conflict in the evidence as to the fact that as early as 1855 there was a traveled road along the south line of the sixty acres, and that such road continued to be used by the public up to 1871, when appellees took possession of it, and, with other lands adjoining it on the south, made what has since been known as "Garfield Boulevard."

It is conceded, if, at the time appellees took such possession, said strip of land was legally a part of Fifty-fifth street, their possession then and since has been lawful. It is not denied that at least a part of this land was in fact at that time in said street, and we think the clear preponderance of the evidence is that all of it was. The important controverted question in the case is as to whether petitioner, or any former proprietor through whom she claims title, had dedicated said strip to the public use for a road or street, and this question is mainly resolved into the inquiry, did William B. Eagan, in 1855, make such dedication as at common law. It is not necessary to cite authorities in support of the proposition that if he did, and the public accepted it, neither he nor subsequent owners claiming under him can repudiate his acts and regain

possession of the land. Whether or not a proprietor has made a dedication is always a question of intention. As was said in *Godfrey* v. *City of Alton*, 12 Ill. 35 : "No particular form is required to the validity of a dedication. It is purely a question of intention. * * * An examination of the cases referred to in argument will show that dedications have been established in every conceivable way by which the intention of the dedicator could be evidenced." Numerous later decisions of this court are to the same effect. We have also often held that "the proof must be clear of an actual intention to dedicate, or of such acts and declarations as should equitably estop the owner from denying such intention." "The owner of the land must do some act, or suffer some act to be done, from which it can be fairly inferred he intended a dedication to the public." (*Kyle* v. *Town of Logan*, 87 Ill. 67.) Intention here, as in other cases where it becomes material, may be proved by the conduct and declarations of the party, and any acts of his satisfactorily showing an intention to dedicate are sufficient.

In 1855 Eagan owned and was in possession of said sixty-acre tract. That year the same was enclosed by a substantial post and board fence. In the absence of proof to the contrary, the presumption would be that Eagan, the owner of the land, caused it to be enclosed, and in this case the evidence affirmatively tends to show that he did so enclose it. The south line of that fence was some distance north of the south line of the tract. Its exact location with reference to that line will be hereafter noticed. At that time streets were opened north and south through the south part of section 10, as follows : On the west line was State street. On the half-mile line, east, Indiana avenue. Between these two streets, Wabash and Michigan avenues, dividing that part of the section into three lots or blocks. On the center section line was Kankakee (now South Park) avenue. On the east line was Cottage Grove avenue. East of this last named avenue the greater portion of the land to the lake was laid off or subdivided into lots and

blocks. That there was then a road, traveled by the public, from Cottage Grove avenue to State street, substantially on the south line of section 10, and extending east on the same line to the lake, is established by the evidence beyond question.

There is no conflict in the evidence as to the fact that that road east of Cottage Grove avenue was at that time a street sixty-six feet wide on the section line, nor that the road from the lake to State street was at that early period known as Elm street. Several witnesses testified, and their evidence was uncontradicted, that at places both east and west of the sixty-acre tract that road or street was ditched or thrown up. Where it passed over the ground in question there were trees on either side of it. These witnesses, testifying from common observation, stated that the street was on the section line, that it was sixty-six feet wide, and that the south fence enclosing the sixty-acre tract was on a direct line with the north line of the street. It is true that these and other witnesses say that at that time the lands lying open on the south were passed over diagonally at different points, and that later, the fence on the north being broken down in places, parties sometimes turned out of the direct line of travel and drove in a northerly direction; but all agree that there was at all times a well defined line of travel on the section line.

What must be presumed to have been the intention of the owner of the land in building the fence north of his line? If to those who traveled Elm street and observed its location the fence appeared to be on the north line of the road, as shown by its location east and west, though they could not say, by actual measurement, it was exactly thirty-three feet north of the section line, is not the conclusion irresistible, in the absence of rebutting proof, that the fence was located with reference to the street? The rule is, that in arriving at a conclusion as to whether an act was done by a land owner with the intent to dedicate it to the public use, the location of the property and all its surroundings must be considered.

"Thus, intention to dedicate will be more readily presumed in regard to urban than country, and in regard to well settled or frequented country than in regard to wild, wood, waste or unfrequented land." (5 Am. and Eng. Ency. of Law, 480, and cases cited.) Here it seems highly improbable, from all the surroundings, that the fence was built where it was by mistake or without design, and yet placed so nearly on the line of Elm street as to lead many persons to believe it was on that line.

Appellant contends, however, that whatever may have been the general appearances as to the coincidence of the fence and north line of the street, as a matter of fact the fence was not on the same line, but was crooked, being in some places twenty and at others thirty feet north of the section line. It is true, one witness, George W. Waite, so testified, basing his testimony on what he observed in 1870, when he made a survey of Fifty-fifth street for the park commissioners. Prior to that time parts of the fence had been torn away, and it had been repaired. The witness is not at all specific in his evidence. His recollection of the fence is vague and indistinct. He made no measurements to ascertain how it corresponded with the section line. The testimony of Mark D. White, a witness testifying on behalf of appellees, is more positive and equally intelligent, to the effect that in 1872 posts of the old fence still remaining showed it to have been located on the north line of the street; and John E. Low, another of appellees' witnesses, testified positively that he saw the fence there in 1855, and lived near it from that time to 1859; that the fence was thirty-three feet north of the section line, and on a direct line of the north line of the street; that he assisted a surveyor in making measurements, from which he testified as to the distance from the section line to the fence.

It is insisted, however, that the testimony of this last witness should not be believed, because, as he shows, he was, in 1855, only nine years of age, and could have had no intelli-

gent comprehension of the facts about which he testifies. It is
to be observed that he remained there until 1859, and testifies·
that it was in 1858 that he assisted in making the measure-
ments.   We do not think his testimony should be disregarded,.
though perhaps it is not entitled to the same weight that it·
would have been had he at the time been of more mature
judgment.

Mr. Waite, and perhaps other witnesses, in their testimony,.
spoke of the fence enclosing the sixty-acre tract as a stock
fence, built for the purpose of herding cattle, and counsel for·
appellant construes this language as indicating that the fence·
was only temporary, and therefore its erection did not indicate
an intention on the part of the owner to dedicate the land in
question to the public.   It doubtless was built for the purpose
of enclosing the premises, and whether for pasturing stock or
for purposes of cultivation, why was that strip left unenclosed ?·
All the evidence shows that it was a permanent, well con-
structed fence.

The evidence has been discussed by counsel for appellant
with much skill, but after a careful consideration of the testi-
mony of the respective witnesses we are of the opinion that it
·has been established in this case that the fence built in the·
year 1855 was not only apparently on a line thirty-three feet
north of the south line of section 10, but was so in fact.   And·
that fact being established, no stronger proof of an intention·
to give the strip of land thus thrown out, to the public for a·
street or road could be furnished, unless it were shown that a
written dedication or an actual platting had been made.

We have also examined this record in vain for evidence
tending to rebut the presumption of Eagan's intention to dedi-
cate.   It is not claimed that there was not a sufficient accept-
ance by the public to complete the dedication, if one was made.
No particular length of time need elapse to mature a common
law dedication.   (*City of Chicago et al.* v. *Wright*, 69 Ill. 318.)
Here, Eagan, the dedicator, continued to own the land until

February, 1859, and hence, long before he parted with his title, the dedication was complete, and binding upon him and all subsequent grantees under him. In 1867 the land was included within the limits of the town of Hyde Park, and that municipality took charge of the street for public use. The evidence also shows that as late as 1862 Drexel, the then owner of the land, caused the fence to be repaired. The north and south lines of the street, both east and west, were then still more clearly defined, and the act of repairing the fence was a recognition of the dedication made by his grantor.

It is also claimed that he then, by declarations, admitted that the fence was north of the section line, and language used by him bears that construction. We, however, attach no importance to his declarations, and but little to his act of repairing the fence, for the reason already stated, the dedication being complete when he bought the land. It is not pretended that he, or any subsequent owner, attempted to reclaim the land thrown out by Eagan. It has continued from that time to the bringing of this suit to be a part of a public street, becoming more and more essential to the public travel, without objection or resistance on the part of any one. In 1871, when appellees took possession of it, it was a part of Fifty-fifth street, which the act of the legislature provided should be converted into Garfield boulevard. It was so taken, and has been improved at large expense as a public thoroughfare, and is held for that purpose by appellees. We think the Superior Court was justifiable, under the evidence contained in this record, in holding that possession to be lawful. Its judgment will therefore be affirmed.

*Judgment affirmed.*